## BRECKENRIDGE v. BRECKENRIDGE et al.

No. 14695—Opinion Filed Oct. 14, 1924.

### 1. Parent and Child—Custody of Child—Rights of Father.

The father of a legitimate unmarried minor child is entitled to its custody, services and earnings; but he cannot transfer such custody or services to any other person, except the mother, without her written consent, unless she has deserted him, or is living separate from him by agreement. If the father be dead, or be unable, or refuse to take the custody, or has abandoned his family, the mother is entitled thereto.

**2. Same—Unfitness of Parent—Sufficiency of Evidence.**

In order to justify a court in depriving a parent of the care and custody of his child, the evidence offered to establish the unfitness of the parent must be clear and conclusive, and sufficient to show the necessity for so doing to be imperative.

**3. Same.**

That in order to deprive a father of the custody of his child, it must be shown that his condition in life or his character and habits are such that provision for the child's ordinary comfort and contentment, or for its intellectual and moral development, cannot be reasonably expected at the parent's hands.

**4. Same—Appointment of Guardian as Concluding Parents' Rights.**

The appointment of a guardian by a county court is not conclusive as against the parents' right as to the custody of their child. unless it appears that they had notice of the proceedings, and that the question of their incompetency and suitability was adjudicated.

(Syllabus by Jones, C.)

Commissioners' Opinion, Division No. 3.

Error from District Court, Pittsburg County; Geo. C. Crump, Assigned Judge.

Action by N. B. Breckenridge against A. W. Breckenridge and another. Judgment for defendants, and plaintiff brings error. Reversed and remanded.

J. F. McKeel and Robert S. Kerr, for plaintiff in error.

Geo. M. Porter and John L. Fuller, for defendants in error.

Opinion by JONES, C. This action was instituted in the district court of Pittsburg county, Okla., by the filing of a petition by appellant, praying that a writ of habeas corpus issue to the defendants, appellees in this court, commanding them to bring the body of one Billy Breckenridge into court, and that upon the hearing the custody of said child be delivered to this plaintiff, to which petition appellees, defendants in the trial court, filed a response or answer, in which they charge that the appellant, N. B. Breckenridge, is a disreputable character, immoral and unfit to have the care and custody of his son, Billy Breckenridge, and ask that the petition for writ of habeas corpus be denied. The petition was filed in the district court on June 29, 1923, and an alternative writ was issued requiring the defendants, A. W. Breckenridge and Hanna Breckenridge, to appear in person and bring the body of the said Billy Breckenridge into court on July 6, 1923. Defendants having complied with said order.

the cause came on for trial on said 6th day of July, 1923.

The record in this case is rather voluminous and counsel have prepared extensive briefs covering every phase of the case, but we deem it unnecessary to write a lengthy opinion. The evidence shows that Dr. N. B. Breckenridge, the appellant, was married to a lady of the same name, Miss Mable Breckenridge, daughter of A. W. Breckenridge and Hanna Breckenridge, the appellees herein, in June, 1912, and that the said Billy Breckenridge was born to this union on March 21, 1913, and that his mother, Mable Breckenridge, died on April 6, 1913. At the time of this marriage the appellant was a resident of the city of Merida, in the state of Yucatan, in the Republic of Mexico, and went immediately to that point and was living in or near the city of Merida at the time of the birth of his son, Billy, and the death of his wife.

The appellees are residents of McAlester, Okla., and have so resided for many years. It seems that Billy Breckenridge lived with his father the greater portion of the time. but resided with his grandparents, appellees herein, at various times during his life, he being ten years old at the time of the trial of this case. The relationship between these parties had been amicable and very friendly at all times, so far as the record discloses, up until a short time prior to the institution of this suit when Dr. Breckenridge, the appellant, went to McAlester, Okla., for the purpose of visiting his son, Billy, and was denied this privilege by the grandparents, appellees herein.

On the trial of the case before the district judge the court found in favor of the defendants and against the petitioner, denying the writ prayed for, and gave the custody of the child, Billy Breckenridge, to his grandparents, appellees herein, from which order and judgment of the court. the appellant prosecutes this appeal.

The court in rendering its opinion said in part:

"If possession of the boy would be awarded to the plaintiff from this testimony it would be a **little uncertain** in the mind of the court as to his future. I am looking to the interest of the boy only."

And further said:

"The mysterious part of the plaintiff's testimony with reference to his nativity, his place of birth. don't know whether he was born in the United States, Illinois, or where, that led me to believe pretty strong that there is something wrong in the life of the plaintiff."

The only evidence on this point, to which our attention is called, is a question propounded to Dr. Breckenridge while on the stand and his answer to the same, as follows:

"Q. Now Mrs. Breckenridge said you told her you were born in Illinois, etc., I will get you to state all the facts in that connection. doctor, as best you know them. A. Yes, sir, I think I told her I was born in Illinois and thought I was and I considered myself an American citizen until during the war in 1917-18, I attempted, when everybody down there was put on record as to exactly 'who and what they were, and I tried to prove I was an American citizen and could not do it. The American consul would not register me. I could not produce a birth certificate from up here."

This testimony might not appear of the most satisfactory nature or kind, and the witness was not as positive and certain in his statement as possibly the trial court thought he should have been regarding these matters, but from an examination of the witness's testimony, we find that he frequently used the term "I think," or "I think so," or "I don't think," or that "I am in doubt," when asked about dates and other matters about which the average witness might not be able to state positively, and while such testimony might raise a suspicion, it is wholly insufficient to establish any fact, or to justify the judgment of the court holding that the witness, by reason of such testimony, had proven himself an unfit person to have the care and custody of his own child, a fact that should be established by clear and convincing proof. Testimony which merely raises a suspicion has been declared to be the most dangerous character of evidence and should never be admitted, and should not be considered by a court or jury in arriving at a judgment or verdict, and this is the only evidence that the trial court refers to justifying his judgment in the case.

The evidence taken as a whole shows that Dr. Breckenridge was a man about 54 years of age, had been an active surgeon and practitioner of medicine for more than 25 years, was a graduate in medicine of a number of the leading medical institutions of this government and of Europe, had traveled very extensively, had been married five different times. his first and third wives died, he was divorced from the second and fourth, and at the time of the trial was living with his fifth wife, whom the court in the rendition of his judgment took occasion to compliment very highly by reason of her personal appearance and demeanor, and there was no offer made on the part of the appellees to show that she was not such character of woman as the court adjudged her to be. There was no testimony offered, or effort made to show that Doctor Breckenridge was at fault for any of his unfortunate domestic affairs, and in fact nothing was offered that seriously reflected upon his character. Some twelve or fifteen reputable witnesses were offered, citizens of Ada, Okla., where the appellant lived for more than six years, and was actively engaged in his profession, all of whom testified to his good moral character.

Appellant calls our attention to section 8026, Comp. Stat. 1921, which is as follows:

"The father of a legitimate unmarried minor child is entitled to its custody, services and earnings; but he cannot transfer such custody or services to any other person, except the mother, without her written consent, unless she has deserted him, or is living separate from him by agreement. If the father be dead, or be unable, or refuse to take the custody, or has abandoned his family, the mother is entitled thereto."

Which, in cases such as the one we are here confronted with, unquestionably gives the father the preference right to have the care and custody of his child.

In the case of Zink v. Milner et al., 39 Okla. 347, 135 Pac. 1, there is found a very learned and extended discussion of the question here involved. The trial court in that case, as in this, left the child in the custody of a grandaunt, rather than give it to its father, and in the body of the opinion the court said:

"When from the record before us, it is clearly apparent that an injustice has been done in a given cause. this court in the exercise of its corrective and superintending power, will not hesitate to enter upon an examination of the record, or to correct any error that, for any reason, may have been committed by the trial court."

And further states:

"And it is within the power of the courts to deprive parents of the custody of their children; but the necessity for so doing must in all cases be clear and imperative."

The court further said:

"The child's grandaunt, is also a proper person to rear the child, but the father's rights are certainly superior and paramount to those of any other person."

Our attention is also called to the case of Lynch v. Poe et al., 53 Okla. 595, 157 Pac. 907. which was a controversy between a father and maternal grandparents. just as in the case at bar, wherein we find the following rule announced, which appears to be a quotation from the case of Jamison v. Gilbert et al., 38 Okla. 751, 135 Pac. 342, wherein the court held:

"In order to deprive a father of the custody of his child, 'it must be shown that his condition in life or his character and habits are such that provision for the child's ordinary comfort and contentment, or for its intellectual and moral development, cannot be reasonably expected at the parent's hands.'"

And in the case of Jamison v. Gilbert et al., supra, the court said:

"The unfitness which will deprive a parent of the right to the custody of his minor child must be positive and not comparative; and the mere fact that his minor child might be better cared for by a third person is not sufficient to deprive the parent of his right to its custody."

"It is not sufficient. to establish the unfitness of a parent for the custody and control of his minor child, to show that he has some faults of character or bad habits; it must be shown that his condition in life or his character and habits are such that provision for the child's ordinary comfort and contentment, or for its intellectual and moral development, cannot be reasonably expected at the parent's hands."

The cases of Miller v. Miller, 123 Iowa, 165, 98 N. W. 631; Norval v. Zinsmaster, 57 Neb. 158, 77 N. W. 373, 73 Am. St. Rep. 500; Clark v. Lyon et al., 82 Neb. 625, 118 N. W. 472, 20 L. R. A. (N. S.) 171, and decisions from many states of this Union are cited in support of this rule, which evidently has been universally followed by the courts of this country, and in our judgment the proof in this case wholly fails to come up to the standard required; in fact, we find no evidence in the record which seriously challenges the credibility, moral standard, and integrity of the appellant.

The second proposition discussed by appellant is the effect of the appointment of A. W. Breckenridge, one of the appellees, as guardian of 'Billy Breckenridge, by the county court of Pittsburg county sometime prior to the institution of this suit. It seems to be undisputed that it was an ex parte proceeding without notice of any kind to N. B. Breckenridge, the father of the said Billy Breckenridge, and our attention is called to the case of In re Thompson (Neb.) 95 N. W. 805, which seems to be a case in point, wherein the court said:

"The appointment of a guardian by a county court is not conclusive as against the parents' right to the custody of their child. unless it appears that they had notice of the proceedings, and that the question of their incompetency and suitability was adjudicated."

And in the case of Bowles v. Dickson, 32 Ark. 92, the court announces the following syllabus:

"A father both by statute and common law, unless unfit or incompetent, is the natural guardian, and entitled to the custody, care, and education of his minor children."

"He is not bound by proceedings in the probate court, appointing a guardian for his child, to which he is not a party."

"Chancery has jurisdiction to take the child from the statutory guardian and restore it to the father."

Numerous other authorities are cited supporting this rule, from which we conclude that the court was in error in the rendition of the judgment in this case, and that same should be reversed. The appellant insists that the case should not only be reversed, but remanded with directions to the trial court to grant the writ, and we would be inclined to grant this prayer, were it not for certain facts which have been called to our attention by brief of appellees, wherein it is disclosed that when the case was called for trial on July 6, 1923, appellees, defendants in the trial court, filed an application for a continuance for the reason that in view of the fact that the appellant, N. B. Breckenridge, had resided in the Republic of Mexico for ten or twelve years, just preceeding the trial of this case, and that by reason of the great distance, they had been unable to prepare for trial and to secure evidence, which they had good reason to believe could be secured, showing the unfitness of the appellant to have the care and custody of his minor child. We are not advised of the exact nature of the application for continuance, and can only give our judgment of what it contained from indirect statements or references to same by the court and counsel. We find the following language in the record, which is attributed to the court as follows:

"That is the strongest motion for a continuance I ever read in my 25 years' experience. If that motion isn't true, this is a crazy woman that subscribes to it, and she will do anything on earth. If that motion isn't true as set up in here."

And at the close of the trial, the record discloses that the court on its own motion ordered the application for a continuance stricken from the files, to which action counsel for appellees excepted, and asked leave to refile the motion, stating that he did not know what the reason for striking it from the files was, to which the court replied:

"Because it is scurrilous and I think the affidavit taken is of a crazy woman and I

don't want it to affect the record, in this case, gentlemen."

No cross-appeal was taken, but in view of the state of the record and the importance of the issue involved, we are inclined to the opinion that the case should be reversed and remanded for a new trial, and so recommend.

By the Court: It is so ordered.